3 Cal.Rptr.3d 465 (2003)
111 Cal.App.4th 310
In re S.H., a Person Coming Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Respondent,
v.
Marie R., Defendant and Appellant.
No. B161515.
Court of Appeal, Second District, Division Seven.
August 14, 2003.
*467 Mark A. Massey, under appointment by the Court of Appeal, Monterey Park, for Defendant and Appellant Marie R.
Lloyd W. Pellman, County Counsel and Stephanie Jo Farrell, Deputy County Counsel for Plaintiff and Respondent Los Angeles County Department of Children and Family Services.
Certified for Partial Publication.[*]
*466 PERLUSS, P.J.
The juvenile court declared Marie R.'s three children dependents of the court following a contested jurisdiction hearing, ordered the children removed from her custody and directed the Los Angeles County Department of Children and Family Services (Department) to provide reunification services including monitored visitation. Marie R. challenges the juvenile court's ruling permitting two of her children to testify in chambers outside her presence and contends the court's jurisdictional findings are not supported by substantial evidence. Marie R. also argues the court's visitation order, which specifies "if the children refuse a visit, then they shall not be forced to have a visit," impermissibly delegates to her children the authority to determine whether any visits will occur. In the published portion of this opinion we reverse the visitation order, holding that, when the court orders visitation, it must also ensure that at least some visitation, at a minimum level determined by the court itself, will in fact occur. In the unpublished portion of the opinion, we affirm the juvenile court's evidentiary ruling and its orders declaring the children dependents of the court.

FACTUAL AND PROCEDURAL BACKGROUND
On April 24, 2002 the Department filed a petition in the juvenile court pursuant to Welfare and Institutions Code, section 300[1] on behalf of Marie R.'s three children, S.H. (a 15-year-old girl) and S. H.'s brothers A.L. (10 years old) and J.L. (8 years old). The petition alleged that Marie R.'s husband and the children's stepfather, Michael R., physically abused all three children and sexually abused S.H. and that Marie R. knew of the danger and failed to protect the children.[2] The petition also alleged Marie R. failed to provide S.H. with necessary prescription eyeglasses. A first amended petition was filed May 21, 2002 to include additional allegations of physical abuse and sexual abuse by Michael R.

a. Evidence of Abuse and Failure to Protect

At the jurisdiction hearing the court admitted as evidence, without objection, the detention and adjudication/disposition reports prepared by the Department. According to information in the reports, S.H. told a school nurse, a police officer and a social worker that Michael R. had punched her in eye and stabbed her in the hip with a pocketknife. S.H. explained Michael R. hit her almost daily and that Marie R. *468 knew of Michael R.'s physical abuse and told S.H. she deserved to be hit.
According to S. H., Michael R. started sexually abusing her when she was 10 or 12 years old and the family was living in New Jersey. S.H. reported Michael R.'s sexual abuse and testified against him at his criminal trial in New Jersey. According to S. H., Michael R. was convicted of sexual abuse and served two years in state prison for the offense. While in New Jersey, S.H. was removed from Marie R.'s home and placed in foster care before returning to Marie R.'s custody. When Michael R. was released from prison, he again lived with the family despite a court order prohibiting him from having any contact with S.H. Michael R.'s sexual abuse of S.H. resumed. He touched S. H.'s breasts, compelled her to get undressed by putting a knife against her throat and forced her to have sexual intercourse. The abuse continued after the family moved to Los Angeles.
S.H. stated Michael R. hit her with his fist while the family was at Venice Beach, forced her head under the water and told her, "If you want to die, die here." Marie R. never intervened when Michael R. physically abused S.H. or her brothers. Initially, A.L. and J.L. denied that Michael R. hit them. Later, J.L. explained that Michael R. did hit him with his fist and that Michael R. had threatened to hurt him if he told anyone. All three children reported that Michael R. tied them up with a rope as punishment and that Marie R. was present and did nothing. S.H. also stated that she wore prescription eyeglasses, that she lost the eyeglasses the previous year and Marie R. had not replaced them. The adjudication/disposition report notes that S.H. received an eye examination in April 22, 2002 for which the results were "unremarkable."

b. Motion to Permit S.H. and A.L. to Testify in Chambers

The Department did not present any live witnesses as part of its case-in-chief. When Marie R. sought to cross-examine the children regarding their statements in the Department's reports, counsel for S.H. and A.L. moved, over Marie R.'s objection, to allow them to testify in chambers, outside Marie R.'s presence. In response to questioning from Marie R.'s counsel and the court, both children stated they feared testifying in Marie R.'s presence although they were not afraid of the courtroom. Both also testified Marie R.'s presence would likely affect their ability to answer questions. The court permitted S.H. and A.L. to testify in chambers, subject to cross-examination from Marie R.'s counsel, while Marie R. remained in the courtroom and contemporaneously listened to and observed the proceedings via close-circuit television.[3]

c. Cross-Examination of the Children

During cross-examination S.H. repeated her allegations of physical and sexual abuse by Michael R.S.H. explained the first time Michael R. molested her she was 10 years old and Marie R. was not home. Michael R. touched her breasts and her vagina and refused to stop even though she tried to push him away. When she finally broke free of his grasp, S.H. ran downstairs and told her cousin of the incident. According to S. H., the police were *469 called; and Michael R. was sent to prison for two years. Marie R. did not believe S.H. when she accused Michael R. of molesting her. After he was released from prison, Marie R. allowed Michael R. to visit them and ultimately to move in with them. Michael R. forced S.H. to have sexual intercourse at least four times. S.H. did not tell Marie R. about any of these incidents because she knew Marie R. would not believe her. She did tell her cousin. She also testified that Marie R. had grinded up against her in a sexual way on one occasion.
S.H. admitted that, contrary to her statement in the detention report, she did not testify at Michael R.'s trial in New Jersey and that her cousin testified "for her." S.H. conceded she wrote a letter to Michael R. when he was in jail in New Jersey telling him that a cousin had told her to make accusations against him that were not true. S.H. explained that her accusations of sexual abuse against Michael R. were true but the accusation that Michael R. had threatened to kill her was something her cousin told her to say and was not true. S.H. testified she wrote the letter to Michael R. because she felt responsible for him being in jail and she did not want him to "die in jail."
J.L. testified Michael R. hit him and S.H. with a belt and would tie him and his siblings together with a rope as punishment. J.L. denied Michael R. hit him or S.H. with his fist but acknowledged that he had seen Michael R. hit Marie R. A.L. testified Michael R. hit him with his fist and sometimes tied him up with a rope as punishment, although he was not tied to his brother or sister. Marie R. was present during these incidents and did nothing. A.L. remembered seeing Michael R. stab his sister with a barbeque fork, although he had earlier told the Department that S.H. had told him about the incident and he only saw the marks on her skin.

d. Marie R. `s Testimony

Marie R. testified and denied all allegations of abuse and neglect. Marie R. denied Michael R. had ever hit or abused the children and similarly denied that he had hit her. Marie R. admitted that S.H. had accused Michael R. of sexual abuse in New Jersey and that S.H. was removed from her custody and placed in foster care while Marie R. received counseling. Marie R. testified she did not believe Michael R. had sexually abused S.H. at any time because there had never been any "signs." Marie R. stated Michael R. had been acquitted of the charge of sexual abuse, but had been convicted of witness tampering in connection with the abuse allegations, a crime for which he went to jail for two years. Marie R. denied Michael R. had been prohibited under a court order from contacting S.H. Marie R. testified she and Michael R. were still residing together and were homeless.

e. The Juvenile Court's Findings and Orders

The juvenile court sustained the allegations in the petition, expressly finding the children "credible" and Marie R. "not credible." Finding a substantial danger to the children and no reasonable means to protect them other than removal from Marie R.'s custody, the court declared the children dependent persons under section 300, subdivisions (a), (b), (c), (d), (g), (i) and (j).
The court ordered reunification services for Marie R. with monitored visitation in the social worker's office. The court did not specify either the frequency or the length of visitation.[4] Noting the children were fearful of their mother and that the *470 boys had refused visits with her during their detention, the court added, "The social worker shall describe to the children the safeguards in place for monitoring for both mother and fathers, and if the children refuse a visit, then they shall not be forced to have a visit."[5] The court ordered individual therapy for the children and Marie R. and ordered Marie R. to complete parenting classes addressing issues of severe child abuse, sex abuse, child neglect and failure to protect.

CONTENTIONS
Marie R. contends (1) the juvenile court erred in permitting S.H. and A.L. to testify outside her presence; (2) the court's findings of physical abuse, sexual abuse and medical neglect are not supported by substantial evidence; and (3) the visitation order impermissibly delegates the court's authority over visitation to the children.

DISCUSSION

1.-2.[**]

3. The Juvenile Court's Visitation Order Constitutes an Invalid Delegation of Judicial Authority

Visitation is a necessary and integral component of any reunification plan. (§ 362.1, subd. (a)(1)(A);[8] Cal. Rules of Court, rule 1456(f)(4); In re Luke L. (1996) 44 Cal.App.4th 670, 679, 52 Cal. Rptr.2d 53.) "An obvious prerequisite to family reunification is regular visits between the noncustodial parent or parents and the dependent children `as frequently] as possible, consistent with the well-being of the minor.'" (In re Julie M. (1999) 69 Cal.App.4th 41, 49-50, 81 Cal.Rptr.2d 354 (Julie M.).)[9]
It is the juvenile court's responsibility to ensure regular parent-child visitation occurs while at the same time providing for flexibility in response to the changing needs of the child and to dynamic family circumstances. (In re Moriah T. (1994) 23 Cal.App.4th 1367, 1374, 1376, 28 Cal.Rptr.2d 705 ["Visitation arrangements demand flexibility to maintain and improve the ties between a parent or guardian and child while, at the same time, protect the child's well-being."]; In re Danielle W. (1989) 207 Cal.App.3d 1227, 1234-1235, 255 Cal.Rptr. 344.) To sustain this balance the child's social worker may be given responsibility to manage the actual details of the visits, including the power to determine the time, place and manner in which visits *471 should occur. (E.g., In re Jennifer G. (1990) 221 Cal.App.3d 752, 757, 270 Cal. Rptr. 326.) In addition, the parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense; the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation. (Julie M., supra, 69 Cal.App.4th at pp. 50-51, 81 Cal. Rptr .2d 354 [child's aversion to visiting an abusive parent is proper factor for consideration in administering visitation so long as it is not the "the sole factor"].)
Nonetheless, the power to decide whether any visitation occurs belongs to the court alone. (In re Christopher H. (1996) 50 Cal.App.4th 1001, 1008-1009, 57 Cal.Rptr.2d 861 ["The juvenile court has the sole power to determine whether visitation will occur and may not delegate its power to grant or deny visitation to the DSS [ (Department of Social Services) ]."]; In re Jennifer G., supra, 221 Cal.App.3d at p. 757, 270 Cal.Rptr. 326.) When the court abdicates its discretion in that regard and permits a third party, whether social worker, therapist[10] or the child, to determine whether any visitation will occur, the court violates the separation of powers doctrine. (Julie M., supra, 69 Cal.App.4th at p. 51, 81 Cal.Rptr.2d 354 [order giving child the option to either consent or refuse visits with mother unconstitutionally abdicated court's discretion to determine whether visitation would occur to child who essentially held veto power to ensure there would be no visits].)[11] The discretion to determine whether any visitation occurs at all "must remain with the court, not social workers and therapists, and certainly not with the children." (Ibid.; see also In re Christopher H., at p. 1009, 57 Cal.Rptr .2d 861; In re Jennifer G, at p. 757, 270 Cal.Rptr. 326.)
Marie R. argues there is little difference between the unconstitutional order in Julie M. (permitting visitation only with the child's consent) and the order in this case, which states, "if the children refuse a visit, then they shall not be forced to have a visit." In each case, Marie R. argues, the order grants the child de facto veto power to ensure no visitation will occur absent the child's consent (see Julie M., supra, 69 Cal.App.4th at pp. 46, 49-51, 81 Cal.Rptr.2d 354). We agree.
The order in this case does differ from that in Julie M. in that it affirmatively determines there is a right to visitation *472 rather than making visitation entirely contingent on the child's consent.[12] In addition, the court issued several noteworthy companion orders in an affirmative effort to encourage visitation, requiring counseling for both the children and Marie R. and directing the Department to describe the safeguards in place to the children to reduce their fears of visiting with their mother. Yet by failing to mandate any minimum number of monitored visits per month or even to order that some visitation must occur each month, the court's abstract recognition of Marie R.'s right to visitation is illusory, transforming the children's ability to refuse "a visit" into the practical ability to forestall any visits at all.
We are not suggesting either that the juvenile court must always specify the frequency or length of visits (compare In re Jennifer G., supra, 221 Cal.App.3d at p. 757, 270 Cal.Rptr. 326 [court should "determine whether there should be any right to visitation and, if so, the frequency and length of visitation"] with In re Christopher H., supra, 50 Cal.App.4th at p. 1009, 57 Cal.Rptr.2d 861 [rejecting such a requirement] and In re Moriah T., supra, 23 Cal.App.4th at p. 1376, 28 Cal.Rptr .2d 705 [same]) or that the court may not direct that the child's wishes with respect to the timing, length or location of visits be considered (see In re Nicholas B. (2001) 88 Cal.App.4th 1126, 1138-1139, 106 Cal. Rptr.2d 465; In re Danielle W., supra, 207 Cal.App.3d at p. 1237, 255 Cal.Rptr. 344). Indeed, the Department and mental health professionals working with it and with the dependent child may determine when visitation should first occur. (See In re Chantal S. (1996) 13 Cal.4th 196, 203-204, 51 Cal.Rptr.2d 866, 913 P.2d 1075.) However, in fashioning an appropriate visitation order the juvenile court must recognize that any factor that may be considered, even to a "limited" extent, can become decisive (the "tipping factor") in some instances in determining whether visitation will occur, otherwise it is not truly a factor at all.
Accordingly, while the juvenile court may allow the child to refuse to attend a particular visit, to prevent the child from exercising a de facto veto power, there must be some assurance that, should that occur, another visit will be scheduled and actually take place. The simplestbut, by no means, the onlyway to accomplish this would be for the juvenile court to order a minimum number of visits per month and to impose any essential conditions (for example, whether the visits are to be monitored or occur in a neutral setting), while allowing the Department to organize other details of the visitation.[13] *473 In no event, however, may the child's wishes be the sole factor in determining whether any visitation takes place, either as a formal matter or, as occurred in the case now before us, by effectively giving the children the power to veto all visits. (Julie M., supra, 69 Cal.App.4th at p. 50, 81 Cal.Rptr.2d 354 [child's aversion to visiting an abusive parent is proper factor for consideration in administering visitation so long as it is not only factor determining whether any visitation occurs at all]; In re Danielle W., supra, 207 Cal. App.3d at p. 1237, 255 Cal.Rptr. 344.)

DISPOSITION
The portion of the July 18, 2002 order regarding Marie R.'s visitation with the children is reversed. In all other respects the order of July 18, 2002 sustaining the allegations of the petition and declaring the children to be dependents of the juvenile court is affirmed. The matter is remanded to the juvenile court to conduct a new hearing on the issue of visitation.
We concur: JOHNSON, J., and MUNOZ (AURELIO), J.[***]
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 1 and 2 of the Discussion.
[1] All statutory references are to the Welfare and Institutions Code.
[2] A.L. and J.L. are S. H.'s half brothers. Neither S. H.'s alleged father nor A.L. and J. L.'s alleged father has appeared in the dependency proceedings.
[3] The record indicates Marie R. was able to listen contemporaneously to the in-chambers proceedings from the courtroom via some form of electronic device. The parties have confirmed Marie R. was also able to view the proceedings via closed-circuit television. We encourage the juvenile court in future cases to ensure that the record reflects that closed-circuit television is being used during in-chambers examination of witnesses.
[4] The minute order entered following the disposition hearing simply provides, "A regular visitation scheduled to be established as follows: [¶] As reflected in the Attorney Order dated 07/18/02 contained in the Case File, and submitted by Case Dispo Plan." The case disposition plan, signed by counsel, contains no schedule for visitation and specifies only "monitored" visitation, with "no discretion to liberalize" granted to the Department.
[5] In its "indicated" decision, the dependency court stated the children's role in determining whether visits would occur in similar terms: "The social worker shall discuss the safeguards with the children, and if the children, after hearing of these safeguards, refuse to visit, they shall not be forced."
[**] See footnote *, ante.
[8] Section 362.1, subdivision (a)(1)(A), provides, "In order to maintain ties between the parent or guardian and any siblings and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent or guardian, ... any order placing a child in foster care, and ordering reunification services, shall provide as follows: [¶] ... for visitation between the parent or guardian and the child. Visitation shall be as frequent as possible, consistent with the well-being of the child."
[9] The court may deny a parent visitation only if visitation would be harmful to the child. (§ 362.1, subd. (a)(1)(B); see In re Christopher H. (1996) 50 Cal.App.4th 1001, 1008, 57 Cal.Rptr.2d 861; In re Luke L., supra, 44 Cal.App.4th at p. 679, 52 Cal.Rptr.2d 53.)
[10] Division Four of this court in In re Donnovan J. (1997) 58 Cal.App.4th 1474, 1477, 68 Cal.Rptr.2d 714, reversed a visitation order that simply stated, "Father has `no visitation rights without permission of minors' therapists'" because it neither required the therapists to manage ordered visitation nor set any criteria (such as satisfactory progress) to inform the therapists when visitation was appropriate and gave them "unlimited discretion to decide whether visitation is appropriate." A therapist, however, may be allowed the limited discretion to determine when court-ordered visitation should begin. (In re Chantal S. (1996) 13 Cal.4th 196, 203-204, 51 Cal.Rptr.2d 866, 913 P.2d 1075 [order vesting discretion in therapist of parent's choice to determine when parent had made "satisfactory progress" so that ordered visitation could begin is proper].)
[11] Article III, section 3, of the California Constitution provides, "The powers of state government are legislative, executive and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." The entire judicial power of the state is vested in the constitutional courts. (Cal. Const., art. VI, § 1.) Under the separation of powers doctrine judicial powers may not be completely delegated to, or exercised by, either nonjudicial officers or private parties. (See In re Danielle W., supra, 207 Cal.App.3d at pp. 1235-1236, 255 Cal.Rptr. 344.)
[12] In this regard the order is similar to the order considered by Division Three of this court in In re Danielle W., supra, 207 Cal. App.3d 1227, 255 Cal.Rptr. 344, which granted visitation "at the discretion" of both the Department and the children and provided that the juvenile court "would not force the children" to visit if they did not want to visit. In the context of that case, the In re Danielle W. court upheld the order, concluding that it merely required the Department to take into account the children's wishes in connection with the visitation and in no way vested the children with the power "to do more than express their desires in th[at] regard." (Id. at p. 1237, 255 Cal.Rptr. 344.) However, while upholding the order, Division Three expressed serious reservations, which we share, about visitation orders that fail to provide the Department with guidelines as to the prerequisites of visitation or any limitations or required circumstances. (Ibid.)
[13] The court might order, for example, that there be two monitored visits per month to take place at the Department's offices or another neutral setting and that each visit will last, at most, for two hours, leaving to the Department and the children to determine when the visits will actually occur within the month and whether any particular visit would last for the full two hours or some shorter period.
[***] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.